**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Richard J. Moriarty, et al.,** | ) | **CASE NO. 1:08 CV 2180** |
| | ) | |
| **Plaintiffs,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **Vs.** | ) | |
| | ) | |
| **EquiSearch Services, Inc., et al.,** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| **Defendants.** | ) | |

### INTRODUCTION

This matter is before the Court upon Defendant Principal Financial Group, Inc.'s Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. 108). This is a breach of contract action. For the reasons that follow, the motion is GRANTED in PART and DENIED in PART. Count two is dismissed only to the extent it asserts a violation of 6 Del. C. §§ 8-204(2), 8-209, 8-108, and 8-109. Counts three, four, and six are dismissed in their entireties. Counts one and five remain pending. Plaintiffs are to refile their motion for summary judgment on or before November 30, 2009, to address only the remaining claims.

1

**FACTS**

Richard J. Moriarty filed this lawsuit in his capacity as Executor of the Estate of Dorothy Carey, Trustee of the Dorothy Carey Trust, and Trustee of the Milburn Carey Trust, against defendants, EquiSearch Services, Inc., Lee Rothman, Principal Financial Group, Inc. ("PFG"), and Computershare Investor Services, LLC ("Computershare").  Plaintiffs subsequently settled with Computershare.

Milburn and Dorothy Carey solely owned and operated a business called the Perma Seating Company ("Perma Seating").  Attorney Richard Moriarty was the statutory agent and an officer of the company.   In the early 1980s, the Careys wound up the business of Perma Seating and liquidated its assets.  In connection with the winding up, Milburn Carey entered into an agreement with National City Bank ("NCB"), pursuant to which NCB became the trustee of the Perma Seating Retirement Trust ("Perma Seating Trust").  Thereafter, NCB purchased a group annuity contract from PFG[1].  The Careys were the sole beneficiaries of the annuity.  The annuity made monthly payments to Milburn Carey and, upon his death, to Dorothy Carey.

In 2001, PFG demutualized from a mutual insurance company to a stock company.  It appears that each annuitant was entitled to receive either cash or shares in the newly formed stock company.  PFG did not inform either NCB or Dorothy Carey of the demutualization and, since no election was made, stock was issued in lieu of cash.  PFG recorded the shareholder of the PFG stock to be issued as "Perma Seating Company Retirement Trust."  PFG recorded the

---

[1]    There are several predecessor entities to PFG, including both the mutual insurance company and the publically traded stock company.  For the sake of clarity, the Court will refer to each these entities as PFG.

address as: Trustee, 23176 Hardwick Rd., Shaker Heights, OH.  This address is not the address of either NCB or Dorothy Carey.[2]  At all relevant times, the Careys resided in Chagrin Falls.  PFG did not send any notification of any kind regarding the demutualization to either NCB or Dorothy Carey.

An individual named Joseph Mervar resided at the Shaker Heights address listed in PFG's records.  Mervar was licensed to sell insurance in Ohio.  Plaintiffs allege that Mervar was PFG's agent during the initial annuity purchase.  Mervar, however, was not the trustee of the Perma Seating Trust.  Mervar subsequently moved, and several different individuals owned the house on Hardwick Road.

In 2002, Moriarty wrote to PFG inquiring about the monthly benefit Dorothy Carey received from PFG.  Moriarty indicated that the pension arose from her relationship with Perma Seating.  In response, PFG indicated that "upon Carey's death, benefit payments will cease and no other benefits will be payable."  After Dorothy Carey's death, Moriarty again contacted PFG and inquired as to any death benefits available to her estate.  PFG informed Moriarty that there were no death benefits or assets.

Several pieces of correspondence, including dividend checks, were sent to the Hardwick Road address.  The dividend checks were not cashed and were marked "return to sender."  On January 31, 2006, the current owners of the Hardwick Road property informed PFG's agent, Computershare, that no trustee resided at that address.

Computershare and defendant EquiSearch entered into a contract pursuant to which EquiSearch was to locate a current address for the Perma Seating Trust.  Comptuershare and

---

[2]        Milburn Carey died prior to the demutualization.

EquiSearch agreed to share any finder's fee obtained under the agreement.  Thereafter, EquiSearch checked the website for the Ohio Secretary of State and discovered that Richard Moriarty was the statutory agent for Perma Seating.  Rothman, an employee of EquiSearch, contacted Moriarty and informed him that EquiSearch located an asset of Perma Seating.  Rothman refused to discuss the asset any further.  Moriarty informed Rothman that he was operating under the assumption that the asset had no relation to PFG.  Rothman offered to locate the asset upon execution of a signed agreement to pay a 25% finder's fee.  On May 24, 2007, Rothman presented an "Agreement for Asset Location" to Moriarty.  Moriarty signed the agreement as "Trustee for the Milburn K. Carey and Dorothy O. Trusts."

Subsequently, EquiSearch "located" the stock and uncashed dividends.  Plaintiffs received a net payment of approximately $400,000.  Plaintiffs paid EquiSearch a finder's fee of approximately $130,000.  From the time EquiSearch discovered the statutory agent for Perma Seating and the time the stock was sold, the shares declined in value by $74,000.

Plaintiffs filed this lawsuit asserting six claims for relief.  Count one is a claim for breach of the share agreement.  Count two asserts a violation of Article 8 of the Uniform Commercial Code and Delaware statutory law.  Count three alleges a violation of the Ohio Consumer Sales Practices Act.  Count four is a claim for breach of the Agreement for Asset Location.  Count five alleges fraud and misrepresentation and count six is a negligence claim.

PFG moves to dismiss the complaint.  Plaintiffs oppose the motion.

**STANDARD OF REVIEW**

When considering a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the allegations of the complaint must be taken as true and construed liberally in

4

favor of the plaintiff.  *Lawrence v. Chancery Court of Tenn.,* 188 F.3d 687, 691 (6th Cir. 1999).

Notice pleading requires only that the defendant be given "fair notice of what the plaintiff's

claim is and the grounds upon which it rests." *Conley*, 355 U.S. at 47.  However, the complaint

must set forth "more than the bare assertion of legal conclusions."  *Allard v. Weitzman* (*In Re

DeLorean Motor Co.*)*,* 991 F.2d 1236, 1240 (6th Cir. 1993).  Legal conclusions and unwarranted

factual inferences are not accepted as true, nor are mere conclusions afforded liberal Rule

12(b)(6) review. *Fingers v. Jackson-Madison County General Hospital District,* 101 F.3d 702

(6th Cir. Nov. 21, 1996),  *unpublished*.  Dismissal is proper if the complaint lacks an allegation

regarding a required element necessary to obtain relief. *Craighead v. E.F. Hutton & Co.,* 899

F.2d 485, 489-490 (6th Cir. 1990).

  In addition, a claimant must provide "enough facts to state a claim to relief that is

plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 569 (2007).  A pleading

that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of

action will not do." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1955 (2009). Nor does a complaint suffice

if it tenders "naked assertion[s]" devoid of "further factual enhancement."  *Id.*

> To survive a motion to dismiss, a complaint must contain sufficient factual matter,
> accepted as true, to state a claim to relief that is plausible on its face. A claim has facial
> plausibility when the plaintiff pleads factual content that allows the court to draw the
> reasonable inference that the defendant is liable for the misconduct alleged.  The
> plausibility standard is not akin to a "probability requirement," but it asks for more than a
> sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts
> that are "merely consistent with" a defendant's liability, it stops short of the line between
> possibility and plausibility of 'entitlement to relief.'

*Id*. at 1949 (citations and quotations omitted). *See also, Hensley Mfg. v. ProPride, Inc.*, 579 F.3d

603 (6 th Cir.2009).

**ANALYSIS**

1.      Breach of contract (conversion plan)

PFG moves to dismiss count one of the complaint on the grounds that plaintiffs fail to allege a breach of the agreement.  Specifically, PFG claims that the conversion plan required only that PFG mail notice of the demutualization to "the address of each 'Voting Policyholder' as it appears on Company Records."  According to defendant, it complied with this provision by mailing notice to the Hardwick Road property, since that address appeared on PFG's company records.  In response, plaintiffs argue that the conversion plan is not the "sole contract nor the relevant contract" at issue in this case.  According to plaintiffs, a contract exists between PFG and Dorothy Carey as a result of "Dorothy Carey becoming a shareholder."  Plaintiffs argue that PFG owed plaintiffs a duty to provide Dorothy Carey with the shares upon the demutualization.  Plaintiffs further argue that it need not identify a specific term breached by PFG.  Rather, according to plaintiffs, notice pleading requires only a short plain statement of facts giving rise to a cause of action.  Regardless, according to plaintiffs, PFG failed to properly register and deliver the shares.  Plaintiffs further allege that they were damaged by PFG's breach because they incurred a finder's fee in relation to the stock.

Neither party engages in a choice of law analysis.  The mutual insurance company, as it existed prior to the demutualization, appears to be an Iowa entity, as the conversion occurred pursuant to Iowa law.  Plaintiff was located in Ohio.  In addition, it appears that the entity ultimately formed as a result of the demutulization is a Delaware company.  Regardless, no party disputes that basic contract law principles apply.  Accordingly, provided that plaintiffs properly allege the existence of a contract, a breach thereof, and resulting damages, plaintiffs' complaint

6

will survive PFG's motion to dismiss.

With regard to the existence of a contract, plaintiffs allege as follows,

67.     The PFG stock transaction for 9,058 shares to be issued to the Trustee of the Perma Seating Retirement Trust constituted a contract between PFG and the rightful owner....

***

69.     PFG breached its *contract of share ownership* with Dorothy Carey.... (emphasis added)

70.     PFG further breached its contract with its shareholder....

PFG argues that the applicable contract is the plan of conversion.  Accordingly, PFG attaches a copy of that document to its motion to dismiss.  In response, plaintiffs claim that the plan of conversion is not the relevant contract.  According to plaintiffs, a contract arises between PFG and Dorothy Carey as a result of the shareholder relationship.

Upon review, the Court concludes that plaintiffs allege the existence of a contract, but that PFG correctly identifies the applicable contract.  The demutulization of the original mutual insurance company is the event giving rise to plaintiffs' ultimate stock ownership rights in PFG.  Thus, plaintiffs' acquisition of stock is wholly dependent upon plaintiffs' exchange of ownership rights in the mutual insurance company.  In exchange for those rights, plaintiffs acquired shareholder rights in the newly formed entity.  All of these rights (and the exchange itself), however, are governed by the plan of conversion.  Absent the plan and attendant execution of the conversion itself, plaintiffs would have acquired no stock rights.  Thus, the only "contract" that could apply to the parties' relationship is the conversion plan.

The Court now turns to whether plaintiffs allege that a breach occurred.  Upon review of the complaint, the Court finds that plaintiffs allege the existence of a breach.  Specifically, the

complaint contains the following allegations,

28.     After the 2001 demutualization, PFG never notified Dorothy Carey nor NCB of the demutualization, nor did PFG ever register said demutualization shares to Dorothy Carey nor to NCB, nor did PFG ever deliver said demutualization shares to Dorothy Carey nor NCB, nor did PFG ever send any notifications to Dorothy Carey nor to NCB, nor did PFG send any dividends to Dorothy Carey nor to NCB.

69.     PFG breached its contract of share ownership...by failing to effectively deliver to the shareholder these 9,058 shares, by failing to effectively record said shareholder information, by failing to notify said shareholder, by failing to issue and deliver share ownership to the shareholder, dating back to the issuance of the PFG shares at PMI's demutualization in October 2001.

On the face of the complaint, plaintiffs allege the element of breach.  PFG, however, argues that no breach occurred.  Specifically, PFG argues that it complied with the provisions addressing notice and issuance of stock.

With regard to notice, the Court finds that PFG's argument lacks merit.  PFG cites to the conversion plan's provision regarding notice of the members' meeting.  That provision, however, provides that notice of the members' meeting must be sent to each "Voting Policyholder as it appears on Company Records." (Conversion plan at ¶ 4.2).  Although not entirely clear from the complaint, it appears that plaintiffs allege that the "Voting Policyholder" is either plaintiffs  (as beneficiaries) or National City Bank (as owner).  (Compl. ¶¶ 26,27). Plaintiffs allege that PFG possessed the Careys' address and sent benefits to the correct address for years.  Based on these allegations, the Court finds that plaintiffs sufficiently allege that PFG possessed this address in its "Company Records."  As a result, plaintiffs' allegations are sufficient to allege a breach of the provision.[3]

_____

[3]     PFG also claims that it did not breach the provision requiring that notice be published in certain newspapers.  PFG points out that

8

With regard to the issuance of stock, the conversion plan provides,

(c) As soon as reasonably practicable following the Effective Date, but in any event no more than 60 days following the Effective Date...(i) the Holding Company shall issue to the Eligible Policyholders entitled to receive common stock...a number of shares of Common Stock determined in accordance with Article VII registered in the respective names of such Eligible Policyholders....

(Conversion plan at A-11).

PFG cites paragraph 50 of the complaint in support of its position that the complaint itself alleges that PFG complied with this provision.  Paragraph 50 provides,

50.      ....Defendants then proceeded with the issuance of then the liquidation of the 9,058 shares of PFG on August 28, 2007....

The paragraph goes on to provide that plaintiffs sold the shares and received compensation from the sale.  Contrary to PFG's argument, this allegation falls far short of establishing compliance with the plan's issuance provision.  As an initial matter, it is abundantly clear from the complaint that plaintiffs are alleging that PFG did not properly issue the shares to plaintiffs.  (Compl. ¶ 26).  In addition, the allegation in paragraph 50 provides that the shares were issued to plaintiffs on August 28, 2007.  This Court cannot say that the issuance of the stock to plaintiffs six years after the demutualization complies with the conversion plan.  On its face, it requires the stock to be issued to Eligible Policyholders no more than 60 days after the "Effective Date" of the demutualization.  There is no allegation supporting the argument that PFG complied with this provision.[4]

_____

plaintiffs do not allege a breach of this provision.  Upon review of the complaint, the Court agrees with PFG.

[4]      The Court recognizes that PFG is arguing that the "Eligible Policyholder" is Trustee, Perma Seating Trust Company and that by issuing stock in this manner PFG complied with the conversion

9

The Court further rejects PFG's argument that plaintiffs fail to state a claim for breach of the delivery provision.  That provision requires PFG to issue uncertified shares (in book-entry form) to each Eligible Policyholder within 60 days of the "Effective Date" of the demutualization.  The provision further provides each registered shareholder with the right to obtain stock certificates representing the shares.  The Court finds that, for the same reasons set forth above, i.e., plaintiffs allege that the stock should have been issued to either NCB or Dorothy Carey, the complaint sufficiently alleges a breach of this provision.  There is simply no *allegation* suggesting that PFG complied with this provision.

PFG also argues that plaintiffs' claim for violation of the Ohio Unclaimed Funds Act fails because the statute contains no private right of action.  In response, plaintiffs concede they are not asserting a claim under the statute.  Rather, plaintiffs argue that all statutes are implied terms in parties' contracts.

Upon review, the Court finds that plaintiffs may not state a claim for violation of the Ohio Unclaimed Funds Act.  As an initial matter, plaintiffs concede that they are not purporting to assert such a claim.  Moreover, the Court rejects plaintiffs' argument that a violation of one of the provisions of the Ohio Unclaimed Funds Act would somehow constitute a breach of contract. Plaintiffs cite no law in support of this theory[5] and, moreover, fail to address why Ohio's statute would be implied into the contract in any event.  The plan of conversion provides for the

---

plan.  This Court is careful to note that it is not reaching this issue because the complaint sufficiently alleges that the stock should have been issued to either NCB or Dorothy Carey.  Absent factual information, the Court simply cannot address this argument.

[5]  Plaintiffs cite one case purporting to support this argument.  The case, however, is not at all on point.

10

demutualization of an Iowa company into a Delaware stock corporation.  Plaintiffs make no

argument as to why the Ohio Unclaimed Funds Act would become part of that contract.

Accordingly, to the extent plaintiffs are claiming that a violation of that statute amounts to a

breach of contract, the argument is rejected.

        2.       U.C.C. Article 8 and Delaware statutory law

PFG moves to dismiss count two on the grounds that the statute of limitations precludes a

claim for failure to properly deliver and register the stock.  PFG relies on the statute of

limitations set forth in the U.C.C. for breach of contract for the sale of goods.  PFG also argues

that plaintiffs' claim for violation of the U.C.C. must be dismissed because there is no private

right of action thereunder.  Alternatively, PFG argues that plaintiffs allege that the shares were in

fact issued until plaintiffs liquidated the account.  PFG further claims that plaintiffs cannot state

a claim for improper restriction of a security.

In response, plaintiffs argue that the claim did not accrue until plaintiffs incurred

damages.  The damages constitute the payment of the finder's fee, which was paid in 2007.  In

addition, plaintiffs allege that the statute of limitations is tolled under the "time of discovery

rule" or the "continuous breach doctrine."  Plaintiffs further point out that PFG relies on the

incorrect statute of limitations.  According to plaintiffs, the statute of limitations applicable to

breach of contract claims applies.  Plaintiffs further argue that Delaware statutes "cite numerous

duties and obligations of issuers of stock and case law indicate private rights of action

thereunder."  Plaintiffs further claim that it is irrelevant whether this case is decided under

Delaware statutory or Delaware common law.  Thus, apparently, plaintiffs claim that even if the

statutory claims do not provide private rights of action, these statutory obligations would be

analyzed in resolving a claim asserted under the common law.

As an initial matter, the Court is somewhat concerned with PFG's analysis regarding the statute of limitations.  PFG appears to rely on the wrong statute of limitations[6] and further erroneously argues that the discovery rule has not been applied in Delaware outside the context of medical malpractice cases.  As plaintiffs point out, and this Court's research reveals, Delaware courts have consistently indicated that the discovery rule *may* be applied to breach of contract cases in the appropriate factual settings.  PFG's citation to a 1982 case is misleading at best, given that the Delaware Supreme Court held the opposite nearly five years ago.  *See, e.g., Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312 (Del. 2004).  *See also, Legatski v. Bethanyforest Associates., Inc.*, 2005 WL 2249598 (Del. Sup. Ct. Sept. 15, 2005); *Marucilli v. Boardwalk Builders, Inc.*, 2002 WL 1038818 (Del. Sup. Ct. May 16, 2002)(providing background regarding the evolution of the discovery rule to breach of contract claims).  Generally speaking, the application of the discovery rule requires an analysis of the underlying facts.  Such an inquiry, however, would be inappropriate on a 12(b)(6) motion.  Accordingly, the Court finds that count two is not barred by the statute of limitations.[7]

Without citing any authority, PFG argues that there is no private right of action under the

---

[6]     PFG cites the statute of limitations applicable to the sale of *goods*.

[7]     The Complaint clearly alleges that plaintiffs had no way of knowing about the demutalization since the notice, subsequent dividends, and election form were sent to the wrong address. Moreover, plaintiffs further allege that they continued to receive monthly payments at the correct address.  Thus, at this stage, the Court concludes that plaintiffs have alleged sufficient facts to survive any argument that dismissal is warranted due to the statute of limitations.  As such, the Court need not reach plaintiffs' alternative argument that the claim did not accrue until 2007.

applicable Delaware code sections.  In response, plaintiffs point to *CAPM Corp. Advisors AB v. Protegrity, Inc.*, 2001 WL 1360122 (Del Ch. Oct. 31, 2001), in which the Court analyzed various provisions of the Delaware U.C.C., including § 8-301 and imposed liability based on violations of the provisions.   As such, plaintiffs claim that a private right of action exists.  In the alternative, plaintiffs argue that even if no private right of action exists, these provisions are implied terms of the contract.  Thus, they are relevant to ascertaining whether a breach occurred.

Upon review, the Court agrees with plaintiffs.  Although there is no caselaw specifically addressing whether each provision relied on by plaintiffs contains a private right of action, the Delaware U.C.C. contains a set of rules undeniably applicable to transactions involving the sale of securities.[8]  Thus, the Court finds it somewhat irrelevant whether the provisions are construed to be "private rights of action" or terms implied into the stock transaction between plaintiffs and PFG.  To the extent Delaware law applies to the transaction, plaintiffs may assert a "violation" of these provisions.

The Court now turns to the specific provisions plaintiffs allege PFG violated.  Plaintiffs allege that PFG violated 6 Del. C. § 301(b), which addresses effective registration and delivery. PFG argues that the complaint fails to state a claim because it issued and registered shares "in the name of the contractholder, Trustee, Perma Seating Company Retirement Trust."  In support of this argument, PFG cites to paragraph 39 of the complaint.  That paragraph, however, expressly alleges that "Attn: Trustee" was not the name of the contractholder.  While plaintiffs

---

[8]     The Court is careful to note that it is not affirmatively stating that
        the Delaware U.C.C. provisions apply to this transaction.  No party
        raises this issue and, as such, the Court makes no such
        determination.

13

allege that the shares were issued to "Trustee, Perma Seating Company Retirement Trust," the allegation further appears to provide that the Trustee is not the correct name of the contractholder.  Reading the allegations broadly, the Court finds that plaintiffs are alleging that the Trustee is not the correct purchaser.  (See, Compl. ¶¶ 25, 26).  As such, the Court cannot say that plaintiffs fail to articulate a basis for invoking 6 Del. C. § 301(b).

The Court agrees, however, that plaintiffs may not rely on 6 Del. C. §§ 8-204(2), 8-209. Those provisions provide,

> A restriction on transfer of a security imposed by the issuer, even if otherwise lawful, is ineffective against a person without knowledge of the restriction unless: (2) the security is uncertified and the registered owner has been notified of the restriction.

6 Del. C. § 8-204(2).

***

> A lien in favor of an issuer upon a certificated security is valid against a purchaser only if the right of the issuer to the lien is noted conspicuously on the security certificate.

6 Del. C. § 8-209.

Plaintiffs allege that the finder's fee constitutes a restriction and a lien.  PFG argues that the finder's fee is not a lien or restriction.  In the alternative, PFG argues that plaintiffs agreed to the finder's fee, thus they themselves placed any restriction or lien on the securities.  PFG further points out that Section 8-209 applies to certificated securities.  According to the complaint, the shares at issue here were not certified.  As such, this provision is wholly inapplicable.  In response, plaintiffs argue that PFG bears the burden of noting any restrictions on transfer. According to plaintiffs, PFG delegated its duty to register shares to EquiSearch, which charged a 25% fee.  Plaintiffs claim that PFG had a duty to notify plaintiffs of this restriction.  Plaintiffs do not address the issue regarding Section 8-209's certification requirement.  Plaintiffs further argue

that they did not place the restriction on the shares by agreeing to the finder's fee.

Upon review, the Court agrees with PFG that plaintiffs fail to state a claim for violation of these provisions.  As a initial matter, plaintiffs wholly fail to address the plain language in Section 8-209 indicating that the provision applies only to certified shares.  Accordingly, the Court accepts PFG's argument that the provision is inapplicable in that plaintiffs expressly allege that the shares were uncertified at the time the "lien" allegedly existed.  (Compl. ¶¶ 39,20).  With regard to Section 8-204, the Court agrees that the finders' fee is simply not a restriction on transfer as contemplated by the statute.  As an initial matter, plaintiffs cannot say they lacked knowledge of the finder's fee since they paid it.  Furthermore, the fee did not restrict transfer.  Plaintiffs, had they discovered the shares on their own volition, would not have been required to pay the fee.  In all, the finder's fee is simply not the type of "transfer restriction" envisioned by the statute.

The same holds true with respect to plaintiffs' reliance on 6 Del. C. §§ 8-108, 8-109 wherein plaintiffs allege that PFG breached its obligation to warrant that no adverse claim to the security exists.  The finder's fee is not an adverse claim to the security.

> 3.     Violation of Ohio Consumer Sales Practices Act, breach of contract, fraud, and misrepresentation claims

PFG argues that plaintiffs' claims for violation of the Ohio Consumer Sales Practices Act (count three), breach of contract (count four), and fraud and misrepresentation (count five) must be dismissed because plaintiff failed to properly plead the existence of an agency relationship between EquiSearch and PFG.  PFG asks the Court to take judicial notice of the Stock Transfer Agency Agreement between PFG and Computershare.  According to PFG, the agreement shows that Computershare was PFG's agent.  PFG goes on to argue that EquiSearch was

15

Computershare's agent.  Thus, at best EquiSearch was PFG's subagent.  According to PFG, *Texas Co. v. Brice*, 26 F.2d 164 (6th Cir. 1928) forecloses plaintiffs' claim.  PFG also argues that plaintiffs' settlement with Computershare effectively released PFG from liability as well.

In response, plaintiffs argue that *Texas Co.* is inapplicable.  Plaintiffs claim that the case interpreted Tennessee law.  According to plaintiffs, Delaware law governs the breach of contract claim while the remaining claims are governed by Ohio law.  Plaintiffs further argue that Ohio agency law controls the issue of whether an agency relationship exists.  In addition, plaintiffs claim that its release of Computershare does not preclude recovery against PFG.

Upon review, the Court finds that plaintiffs fail to allege the existence of an agency relationship between PFG and EquiSearch.

The complaint sufficiently alleges the existence of an agency relationship between PFG and Computershare.  Computershare allegedly acted as PFG's transfer agent and, in fact, these parties entered into a Stock Transfer Agency Agreement.[9]  That agreement outlines Computershare's duties with regard to processing stock transfers.  The agreement does not, however, expressly provide Computershare with the ability to appoint subagents.  With regard to the existence of an agency relationship between PFG and EquiSearch, the complaint generally

---

[9]     According to PFG, the Court may rely on the Stock Transfer Agency Agreement entered into by PFG and Computershare without converting the motion to dismiss into a motion for summary judgment.  PFG claims that the document is referenced in the complaint.  Alternatively, PFG asks that the Court take judicial notice of the agreement.  Plaintiffs do not object to the Court's consideration of the Stock Transfer Agency Agreement.  Although the Court finds that judicial notice would be inappropriate, the Court will consider the agreement in that plaintiffs generally refer to its existence in the complaint and plaintiffs do not voice any opposition.

16

alleges that PFG entered in the Stock Transfer Agency Agreement with Computershare and that Computershare, in turn, entered into an agreement with EquiSearch to located Perma Seating Company.  (See, Compl. ¶ 42).  The primary allegation addressing the relationship between the parties is as follows,

> In 2006 or 2007, PFG's agent, Computershare, entered into a contract with Defendant EquiSearch to perform a search for a current address for Perma Seating Company in Ohio.  Computershare and Defendant EquiSearch had an agreement to share the Finder's Fee derived from such search for PFG Shareholders, and said agreement between Computershare and Defendant EquiSearch further benefitted PFG, as it was PFG's business that was being carreied out by Computershare and Defendants EquiSearch and Rothman.  Defendant PFG as principal is responsible for Defendant EquiSearch's and Rothman's conduct as well as Computershare's conduct in such transaction by virtue of Ohio statutory and common law of agency.

(Compl. ¶ 42).

The Court finds that the only fair reading of this allegation is that plaintiffs are claiming that EquiSearch became an agent of PFG as a result of EquiSearch's relationship with Computershare.  There are no allegations suggesting that EquiSearch and PFG had any relationship whatsoever independent of Computershare.[10]  As such, the Court agrees with PFG that its liability could only arise if EquiSearch could be considered a subagent for PFG.

---

[10]     In the context of count one plaintiffs make two general allegations regarding an agency relationship between EquiSearch and PFG. Plaintiffs further allege in count three that PFG, as principal to defendants EquiSearch and Rothman and "liable for the acts of these agents."  The Complaint as a whole, however, clearly sets forth the nature of the relationships between PFG, Computershare and EquiSearch.  Moreover, as the Supreme Court recently noted, where a complaint pleads facts that are "merely consistent with" a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief,' and, therefore, fails to state a claim. *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). Plaintiffs assert no facts supporting their theory that EquiSearch acted as an agent of PFG.

The Court now turns to whether plaintiffs allege the existence of a subagency relationship.  Under general agency law, a principal is liable for the subagent's acts "if the principal authorizes the agent to appoint a subagent to carry out the principal's business." *Hatzlachh Supply, Inc., v. Appliance Center of Toledo, Inc.*, 1988 WL 101197 (Oh. Ct. App. Sept. 30, 1988)(citing Restatement of the Law 2d, Agency (1958) 352, Section 142).  See also, 3 Am. Jur. 2d Agency § 161 ("if an agent is authorized to appoint a subagent or the principal ratifies such appointment, the latter is, as to third persons, bound by the acts of the subagent to the same extent as if the agent had performed them").  Thus, to the extent PFG either authorized Computershare to appoint EquiSearch or ratified any such appointment, PFG may be liable for EquiSearch's acts.[11]  As set forth above, the Stock Transfer Agency Agreement does not expressly permit the use of subagents.  Moreover, plaintiffs do not allege that PFG authorized Computershare to appoint EquiSearch.  Nor do plaintiffs allege that PFG ratified any such appointment.  Accordingly, the Court finds that plaintiffs fail to state a claim for vicarious liability.  To the extent th e claims asserted in counts three through five arise as a result of the imputation of liability from EquiSearch to PFG, the claims fail to state a claim for which relief

---

[11]    Plaintiffs cite *Illinois Controls, Inc. v. Langham*, 639 N.E.2d 771 (Oh. 1994) in support of their position that PFG may be liable as an undisclosed principal to the agreement between Computershare and EquiSearch.  As PFG points out, however, an undisclosed principal may only be held liable if the undisclosed principal adopts or ratifies the agreement, or accepts benefits under the agreement with knowledge of its terms.  Plaintiffs, however, allege no facts whatsoever in support of this theory.  Although plaintiffs make a general allegation that PFG somehow benefitted because it was "PFG's business that was being carried out," they expressly allege that only Computershare and EquiSearch received compensation under the agreement.  In light of this allegation, the Court finds that the undisclosed principal theory does not save plaintiffs' claims.

may be granted.

Upon review, the Court finds that counts three and four must be dismissed because plaintiffs fail to properly plead the existence of a subagency relationship and these claims are not directly asserted against PFG. For example, in count three plaintiffs expressly allege that liability is dependent upon the existence of an agency relationship. (Compl. ¶ 87). Similarly, with regard to count four, plaintiffs allege that the asset location agreement is between plaintiffs and EquiSearch. Therefore, PFG's liability must necessarily be vicarious in that PFG is not a party to the agreement. Having concluded that plaintiffs cannot establish a claim for vicarious liability based on the allegations in the complaint, these claims fail to state a claim against PFG and dismissal is warranted.

On the other hand, the Court finds that count five, which alleges fraud and misrepresentation, is not limited to vicarious liability. Rather, the Court agrees with plaintiffs that the claim contains direct allegations against PFG rendering agency theory irrelevant. For example, in Paragraph 105, plaintiffs allege that they "had a right to rely upon their inquiries of PFG in October 2002 and in 2004, and PFG's reply in May 2003, that no records of any pension agreement, no Retirement Trust or Trustee, and that there were no further benefits...." This alleged wrongdoing is asserted directly against PFG for its own actions. Thus, the fact that plaintiffs fail to allege the existence of a subagency between PFG and EquiSearch does not foreclose this claim. PFG made no other arguments in support of dismissal. Accordingly, the claim remains pending.[12]

---

[12]     This Court, having dismissed the vicarious liability claims, need not reach the issue of whether the release of Computershare acts as a release of the claims asserted against PFG for acts engaged in by EquiSearch. Nor must the Court address the effect of *Texas Co. v.*

4.	Negligence

According to PFG, count six is premised on the allegation that PFG negligently executed its contract with plaintiffs.  PFG argues that the claim fails because it is no tort to breach a contract.   Alternatively, PFG argues that the economic loss doctrine bars plaintiffs' negligence claim.  PFG further argues that the statute of limitations bars this claim.

Plaintiffs argue that their breach of contract claim can give rise to a claim for negligence. Plaintiffs claim that PFG had a duty separate from its contractual duty.  In addition, plaintiffs argue that the economic loss doctrine does not bar the claim because a separate duty exists independent of PFG's contractual duties.  Plaintiffs further argue that they suffered losses other than economic damages in the form of a "deprivation in interest to personal property."  In addition, plaintiffs dispute that the claim would be barred by the statute of limitations.

Upon review, the Court finds that the negligence claim must be dismissed.  Well-settled Ohio law provides that "it is no tort to breach a contract, regardless of motive." *Battista v. Lebanon Trotting Ass'n*, 538 F.2d 111, 117 (6th Cir. 1976).  *See also Textron Financial Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261, 1270-71 (Ohio App. 9th Dist. 1996) ("the motive of a breaching party to a contract is irrelevant to the contract action"); *Salvation Army v. Blue Cross and Blue Shield of Northern Ohio*, 636 N.E.2d 399, 403 (Ohio App. 8th Dist. 1993) ("It is not a tort to breach a contract, no matter how willful or malicious the breach); *Teknol v. Buechel*, 1999 WL 33117391 (S.D. Ohio Aug. 9, 1999) (same).

Thus, where the gravamen of the Complaint is an action for breach of contract, appending tortious language such as "willful, intentional or malicious" will not transform the

---

*Brice*, 26 F.2d 164 (6th Cir. 1928).

20

breach of contract action into one sounding in tort.  *Salvation Army*, 636 N.E.2d  at 403.  "A tort

exists only if a party breaches a duty which he owes to another independently of the contract,

that is, a duty which would exist even if no contract existed."  *Battista*, 538 F.2d at 117.

Moreover, "in addition to containing an independent duty of that created by contract, an action

arising out of contract which is also based upon tortious conduct must include actual damages

attributable to the wrongful acts of the alleged tortfeasor which are *in addition* to those

attributable to the breach of the contract."  *Textron*, 684 N.E.2d at 1271 (emphasis in original).

Not only must a plaintiff allege damages in addition to contract damages, in order to

recover on a negligence theory, the party must claim physical damage to persons or property.

This theory is known as the economic loss doctrine.

In *Floor Craft v. Parma Community General Hospital Ass'n.*, 560 N.E.2d 206 (Ohio

1990), the Ohio Supreme Court held that "for actions sounding in negligence, 'the well

established general rule is that a plaintiff who has suffered only economic loss due to another's

negligence has not been injured in a manner which is legally cognizable or compensable.'"

*Floor Craft*, at 208 (*citing Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Ins. Co.*, 537 N.E.2d

624, 630 (Ohio 1989).  "In order to recover indirect economic damages in a negligence action,

the plaintiff must prove that the indirect economic damages arose from tangible physical injury

to persons or from tangible property damage."  *Queen City Terminals, Inc. v. General American

Transportation Co.*, 653 N.E.2d 661, syllabus ¶ 1 (Ohio 1995).  Absent physical injury to person

or property, indirect economic damages may only be recovered in contract.  *Id*. at 667.

In *Chemtrol*, a dispute arose from the sale of a defective "arch dryer."  Although the arch

dryer was subsequently repaired, the initial defect caused plaintiff to incur substantial economic

21

losses.  Plaintiff filed a claim with its insurance carriers to recover for the losses, and the insurance companies brought a third-party complaint against the manufacturer of the arch-dryer alleging negligence, strict liability, breach of express and implied warranties, and breach of contract.  In upholding the trial court's dismissal of the tort claims against the manufacturer, the court held,

> In negligence, the law imposes upon the manufacturer of a product the duty of reasonable care.  That duty protects the consumer from physical injury, whether to person or property.  However, the law of negligence does not extend the manufacturer's duty so far as to protect the consumer's economic expectations, for such protection would arise not under the law but rather solely by agreement between the parties. 'When the promisee's injury consists merely of the loss of his bargain, no tort claim arises because the duty of the promisor to fulfil the term of the bargain arises only from the contract.'

*Chemtrol*, 537 N.E.2d at 630-31.

In essence, the court limited recovery to the terms of the contract because there was no allegation that damage to persons or property occurred.  Although plaintiff failed to provide adequate notice under the contract rendering recovery under a breach of contract theory unavailable, the court noted that "the existence of a contract *remedy* is irrelevant to the determination of whether contract or tort law provides the appropriate set of rules for recovery of damages."  *Id*. at n.8 (quotations omitted) (emphasis added).  See also, *Corporex Dev. & Constr. Mgmt. Inc. v. Shook, Inc.*, 835 N.E.2d 701, 703 (Ohio 2005).

This Court finds that the economic loss doctrine bars plaintiffs' negligence claim in this case.  Plaintiffs allege that PFG was negligent in failing to register and issue shares to them. These duties, however, arise under the plan of conversion.  Plaintiffs do not allege the existence

of any duty that arises separate from the duties created by the plan.[13]  Nor do plaintiffs allege the existence of any physical damage to person or property as a result of the alleged negligence. Accordingly, plaintiffs' negligence claim must be dismissed.

     5.       Waiver

PFG claims that all of plaintiffs' claims are barred by the doctrine of waiver.  According to PFG, it published notice of the demutualization in national publications and on its website.  As such, plaintiffs had constructive notice of the stock rights.  Having failed to argue that the notice was improper, plaintiffs waived any right to assert the claims now. Plaintiffs further argue that Moriarty signed the asset location agreement on behalf of the Perma Seating Trust.  Given his intimate knowledge of the affairs of Perma Seating and the Careys' affairs, PFG argues that Moriarty must have at least constructive knowledge that the only act the Perma Seating Trust engaged in was the purchase of the annuity.  Thus, it follows that plaintiffs had knowledge that the asset to be located was related to PFG.  According to PFG, by signing the asset location agreement, plaintiffs waived any right to recover the finder's fee.

In response, plaintiffs claim that the complaint does not contain facts from which the Court could determine waiver as a matter of law.  According to plaintiffs, nothing in the complaint unequivocally demonstrates that plaintiffs waived the right to assert their claims. Plaintiffs argue that in a letter dated May of 2007, Moriarty expressly indicated that he was signing the asset location agreement based on his belief that the asset has nothing to do with PFG.  Therefore, according to plaintiffs, waiver could not possibly apply.  In essence, plaintiffs

---

[13]     Plaintiffs claim that the duties arise under Delaware statutory law. Even if plaintiffs are correct, however, then plaintiffs' remedy would arise by statute, not in tort.

reserved their rights to file claims in the event the asset related to PFG.

Upon review, the Court finds that PFG's argument is not well-taken.  At this stage in the litigation, it is not possible for the Court to ascertain whether Moriarty waived plaintiffs' rights. The doctrine of waiver generally involves an analysis of the relevant facts and the Court cannot say that the complaint establishes, as a matter of law, that plaintiffs waived their rights to assert any claims involving the recovery of PFG stock.

**CONCLUSION**

For the foregoing reasons, Defendant  Principal Financial Group, Inc.'s Motion to Dismiss Plaintiff's Second Amended Complaint is GRANTED in PART and DENIED in PART. Count two is dismissed only to the extent it asserts a violation of 6 Del. C. §§ 8-204(2), 8-209, 8-108, and 8-109.  Counts three, four, and six are dismissed in their entireties.  Counts one and five remain pending.  Plaintiffs are to refile their motion for summary judgment on or before November 30, 2009, to address only the remaining claims.

IT IS SO ORDERED.


 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge


Dated: 10/23/09

24