**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


| | | |
|---|---|---|
| **Richard J. Moriarty, et al.,** | ) | **CASE NO. 1:08 CV 2180** |
| | ) | |
| **Plaintiffs,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **Equisearch Services, Inc., et al.,** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| **Defendants.** | ) | |


**INTRODUCTION**

This matter is before the Court upon Plaintiffs' Motion for Summary Judgment or Partial

Summary Judgment (Doc. 125).  Also pending are Motion for Summary Judgment filed by

Defendant Equisearch Services, Inc. (Doc. 126) and Defendant Principal Financial Group, Inc.'s

Motion for Summary Judgment (Doc. 128).  This case arises out the location and sale of stock.

For the reasons that follow, plaintiffs' motion is DENIED and defendants' motions are

GRANTED.

**FACTS**

1

Richard J. Moriarty filed this lawsuit in his capacity as Executor of the Estate of Dorothy Carey, Trustee of the Dorothy Carey Trust, and Trustee of the Milburn Carey Trust, against defendants, EquiSearch Services, Inc., Lee Rothman (sometimes, collectively, the "Equisearch Defendants"), Principal Financial Group, Inc. ("PFG"), and Computershare Investor Services, LLC ("Computershare").  Plaintiffs subsequently settled with Computershare.

Milburn and Dorothy Carey solely owned and operated a business called the Perma Seating Company ("Perma Seating").  Attorney Richard Moriarty was the statutory agent and an officer of the company.  Perma Seating sought and received favorable treatment from the Internal Revenue Service regarding the creation of a qualified plan, known as the Perma Seating Company Retirement Trust ("Perma Seating Retirement Trust").  Subsequently, the "Trustees of Perma Seating Co. Retirement Trust" submitted an application to PFG[1] for a group annuity ("Group Annuity").  The Group Annuity was issued by and between Perma Seating Retirement Trust and PFG.  The Group Annuity indicates that "Trustees of Perma Seating Company Retirement Trust" is the contractholder.  There are no trust documents for Perma Seating Retirement Trust.

On approximately May 30, 1980, PFG issued Group Annuity Certificate-GIA.  The 1980 Certificate indicates that Milburn Carey is the participant and Dorothy Carey is the contingent annuitant and the beneficiary.  It further provides that the contractholder is Trustees Perma Seating Retirement Trust.  On or about March 17, 1981, PFG received a retirement option election form.  On that form, Dorothy Carey is identified as the contingent annuitant.  The form

---

[1]     There are several predecessor entities to PFG.  For the sake of clarity, the Court will refer to each of these entities as PFG.

2

is signed by Milburn Carey as "participant" and National City Bank as "trustee" for the contractholder.

In March of 1981, PFG received a "Defined Contribution Purchase/Quote Directions to [PFG]."  On that form, Perma Seating Retirement Trust is identified as the contractholder and Milburn Carey is identified as the participant.  The only address listed is located in Chagrin Falls, OH.  Under the "Form of Annuity" section, the following appears,

The Contractholder ☐ retains ownership of this benefit ☒ transfers ownership to the participant

The form is signed by a National City Bank representative as Trustee for the contractholder.

It appears that sometime in 1984, Joseph Mervar contacted PFG.  In response, PFG sent Mervar a letter.  The letter indicates that it is in reference to the "Perma Seating Retirement Trust."  There is a handwritten note indicating that Mervar is a broker, who is helping Milburn Carey complete retirement forms.  The address provided for Mervar is a Shaker Heights address. Moriarty testified that Mervar and the Careys knew each other for "quite a few years."  Mr. Mervar also socialized to some degree with Moriarty.

On July 9, 1984, PFG received a Retirement Option Elections Form, which designated Dorothy Carey as contingent annuitant and "estate" as beneficiary.  The form is signed by Milburn Carey as "participant."  There is no signature on the "contractholder" line.  On July 17, 1984, a "GA Group Retirement Information Sheet" was prepared.  It identifies the contractholder as Perma Seating Retirement Trust and Milburn Carey as the employee.  Dorothy Carey is identified as the co-annuitant.

Milburn Carey began receiving retirement payments on August 1, 1984.[2]  The first check was sent to his bank and the letter from PFG to the bank shows that both Milburn Carey and Mervar were provided copies of the correspondence.  PFG's records contain the Careys' address, which was in Chagrin Falls, Ohio.  Thereafter, as a result of the change in retirement date, PFG issued a new Group Annuity Certificate.  That certificate indicates that the contractholder is the Trustees of Perma Seating Retirement Trust and Milburn Carey is the participant.  Milburn Carey received retirement payments until his death in 1995.[3]  Thereafter, Dorothy Carey received retirement payments until her death in 2003.

In 2001, PFG demutualized from a mutual insurance company to a stock company.  The demutualization occurred pursuant to the Plan of Conversion of Principal Mutual Holding Company ("Plan").  It appears that each policyholder was entitled to receive cash, shares in the newly formed stock company, or policy credits.  Under the Plan, each "Voting Policyholder" was to receive notice of a members' meeting and vote on the Plan.  The Plan required that the notice be sent to the "address of each Voting Policyholder as it appears on Company Records." (ECF130-1 at A-10).  The Plan further provides that notice of the members' meeting be published in certain local and national newspapers.  The "Voting Policyholder" is a person who is a "Member" on the "Adoption Date."  A "Member" is defined as an "Owner," and, in the case of a group annuity, the "Owner" is the person identified as the "Contractholder."  The Plan

---

[2]    On October 18, 1985, the Ohio Secretary of State cancelled the corporate charter of Perma Seating.

[3]    Moriarty acted as the trustee for Milburn Carey's trust.  Later, he administered the estate of Dorothy Carey and acted as the trustee for her trust.

4

requires that notice be sent to "the Owner's last known address as shown on Company Records."

PFG sent notice to "Trustee" and "23176 Hardwick Rd., Shaker Heights, OH."  This is the address of Mervar.  PFG received no response regarding the Perma Seating Retirement Trust. As a result, it appears that 9,058 shares of stock were issued in book form.  The Plan required that the shares be issued in "book entry form as uncertified shares."  It is undisputed that the cash value of those shares at the time of the demutualization was $167,573.

On October 25, 2002, Moriarty sent a letter to PFG regarding Dorothy Carey.  In the letter, Moriarty indicates that he represents Dorothy Carey and is seeking information regarding her "pension agreement" with PFG.  The letter states that the pension arose from her affiliation with Perma Seating Company.   Nearly seven months later, PFG responded.  In its response, PFG states that the monthly benefits Dorothy Carey receives will stop upon her death and no other benefits will be payable.  The letter makes no mention of any stock interests.   Dorothy Carey died on December 7, 2003.  According to Moriarty's affidavit, he again contacted PFG regarding any potential death benefit and PFG advised that no benefit existed.

The shares were held by a transfer agent.  As of January 1, 2005, Computershare acted as the transfer agent.  The transfer agents mailed annual statements, as well as dividend checks, to the Hardwick Rd. address.  The dividend checks went uncashed.  In 2006, Mr. H. Richard Obermanns notified Computershare that he received a dividend check for Perma Seating Company Retirement Trust at that address.  Mr. Obermanns currently resides at the Hardwick Rd. address and is not connected with Perma Seating.  It appears that Mervar sold the house and, ultimately, Mr. Obermanns purchased it.

5

Upon learning that Perma Seating Company was not associated with the Hardwick Rd. address, Computershare entered into an agreement with Equisearch to locate Perma Seating Company Trust.  PFG is not a party to the agreement.  On May 24, 2007, Lee Rothman, an employee of Equisearch, telephoned Moriarty.  Rothman told Moriarty that he obtained Moriarty's name through the Secretary of the State of Ohio, as the agent for Perma Seating Retirement Trust.  Rothman informed Moriarty that an asset existed that Rothman believed belonged to Perma Seating Retirement Trust.  He further informed Moriarty that Equisearch was in the business of recovering unclaimed assets and that Equisearch would bring the asset into Moriarty's possession.  In addition, Rothman informed Moriarty that he would need to sign a contract and that the service would be performed for a fee.[4]  Rothman indicated that he would send Moriarty a copy of the contract for his signature.

Moriarty received a copy of a draft Agreement for Asset Location ("Agreement").  Thereafter, Moriarty contacted Rothman to discuss the capacity in which he should sign the agreement, as Moriarty was not the trustee for Perma Seating Retirement Company.  Moriarty

---

[4]      Evidence regarding this telephone call is contained in Moriarty's deposition.  (Doc. 127-2 at p. 51-31).  In connection with these motions, Moriarty offers his own affidavit in which he avers that "Mr. Rothman would not disclose what he knew, what he had, or what his firm would do, other than locate an asset pertaining to Perma Seating Comapny, and a Perma Seating Company Retirement Trust."  (Doc. 125-3 at ¶ 22).  The Equisearch Defendants strenuously argue that Moriarty submitted an affidavit that directly contradicts his deposition testimony.  Although there may be slight contradictions, the Court finds that the deposition testimony simply expounds or clarifies the statement in the affidavit.  Accordingly, the Court finds that, for what its worth, the affidavit may be considered in conjunction with the deposition testimony.

also attempted to negotiate the 25% fee.  Rothman refused, indicating that had already been

reduced from Equisearch's usual 35% fee.  Moriarty believes he expressed some concern to

Rothman that the asset was somehow related to the PFG annuity.

Before signing the Agreement, Moriarty discussed its terms with a lawyer in Moriarty's

office.  On June 8, 2007, Moriarty signed the Agreement as trustee for the Milburn and Dorothy

Trusts.  Thereafter, on June 21, 2007, Rothman sent Moriarty a letter, along with certain

documents.  The letter indicates that the asset at issue consists of shares of PFG stock.   On July

19, 2007, Moriarty executed a "Letter of Authorization" permitting Equisearch to sell Perma

Seating Company Retirement Trust's stock holdings in PFG.  On October 5, 2007, Moriarty

received a check in the amount of $374,451.84, representing the proceeds from the sale of the

PFG stock, less Equisearch's search fee of $124,817.28.  It appears that plaintiffs also received a

net dividend payment of $24,456.60, representing the uncashed dividends less a $6,114.15 fee.

It appears that Comptuershare received some portion of the fee received by Equishare.  PFG,

however, did not share in the fee.  According to plaintiff, the shares in PFG lost $73,740 in value

from the point in time the Equisearch Defendants contacted plaintiffs and the date on which the

stock was sold.

Thereafter, plaintiffs filed this lawsuit asserting six claims for relief.  Count one is a

claim for breach of the share agreement.  Count two asserts a violation of Article 8 of the

Uniform Commercial Code and Delaware statutory law.  Count three alleges a violation of the

Ohio Consumer Sales Practices Act.  Count four is a claim for breach of the Agreement.  Count

five alleges fraud and misrepresentation and count six is a negligence claim.  All claims were

asserted against all defendants, with the exception of count six, which was asserted only against

7

PFG.  PFG moved to dismiss the lawsuit and the motion was granted in part.  Accordingly, the sole remaining claims against PFG are counts one, five, and two, to the extent is asserts a violation of 6 Del. C. §§ 8-204(2), 8-209, 8-108, and 8-109.  Equisearch did not move to dismiss the claims asserted against it and, therefore, all claims are pending against Equisearch.[5]

Defendants and plaintiffs cross-move for summary judgment and all motions are opposed.

## STANDARD OF REVIEW

In accordance with Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323.  A fact is material only if its resolution might affect the outcome of the lawsuit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party pursuant to Federal Rule of Civil Procedure 56(e), which provides:

---

[5]     Equisearch seeks summary judgment on all claims.  In response to count three, plaintiffs indicate that the Court "already" dismissed that claim.  Of course as PFG was the only defendant seeking dismissal, the Order of dismissal did not pertain to Equisearch.

8

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

In ruling upon the motion, the court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party. *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995); *United States v. Hodges X-Ray, Inc.*, 759 F.2d 557, 562 (6th Cir. 1985).  However, summary judgment should be granted if the party bearing the burden of proof at trial does not establish an essential element of its case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. 317).

**ANALYSIS**

1. PFG

A.    Counts one (breach of contract) and two (violation of Del. C. §§ 8-204(2), 8-209, 8-108, and 8-109)

Plaintiffs move for summary judgment on the grounds that the evidence demonstrates that PFG failed to properly notify Dorothy Carey of her right to notice, voting rights, and delivery of the 9,058 shares of PFG stock as consideration for her ownership interest in the Group Annuity.  According to plaintiffs, the information was sent to the wrong address.  It appears that plaintiffs claim that Dorothy Carey, by virtue of her relationship with Milburn Carey and his estate, was the "contractholder," and thus, the individual entitled to notice, voting rights, and delivery of the PFG stock.  According to plaintiffs, the form sent to PFG in March of 1981, which indicates that "The Contractholder ☐ retains ownership of this benefit ☒ transfers

9

ownership to the participant," effectively transferred ownership of the Group Annuity to Milburn

Carey.  Upon his death, Dorothy Carey became the contractholder.  In the alternative, plaintiffs

argue that pursuant to the Sixth Circuit's decision in *Bank of New York v. Janowick*, 470 F.3d

264 (6th Cir. 2006), Dorothy Carey was considered the "owner" as a matter of law.  Plaintiffs

argue that PFG breached its contractual duties, as well as Delaware statutory duties, by recording

"Trustee, Perma Seating Retirement Trust" as the registered owner of the shares.  It appears that

plaintiffs also argue that PFG failed to properly record Dorothy Carey's address.  Further,

plaintiffs claim that Mervar was an agent of PFG.  Plaintiffs claim that PFG breached "its

contract" by delegating its duty to register the stock to Equisearch, who charged a 25% fee in

order to "accomplish PFG's lawful duties."  According to plaintiffs, PFG had a duty (apparently,

through Equisearch) to supply Moriarty with information about the stock without charging a fee.

Plaintiffs argue that Equisearch was PFG's subagent.  Even if PFG denies the subagency

relationship, PFG "remains liable by statute as Equisearch, its agent, secured Mr. Moriarty's

signature without disclosure of PFG as the principal."

   In response, PFG argues that Dorothy Carey is not the contractholder of record and, as

such, was not entitled to notice of the demutualization.  Rather, PFG's records disclosed that the

Trustee of Perma Seating Company Retirement Trust is the contractholder for the Group

Annuity.  According to PFG, at most, the form sent in March of 1981 transferred the benefits

under the Group Annuity to Milburn Carey.  Thus, "Trustees Perma Seating Retirement

Company" remained the Contractholder.  Accordingly, notice addressed in this fashion was

proper.  PFG further argues that *Janowick* is inapplicable and, regardless, did not exist until after

the demutualization.  PFG further argues that plaintiffs erroneously claim that Dorothy Carey, as

10

the contingent annuitant, was entitled to the stock as a "benefit" of the Group Annuity.  PFG

claims that it properly registered the names of the shares in book form to Trustees of Perma

Seating Company Retirement Trust" on December 10, 2001.  According to PFG, its actions

comport with Delaware law.  In addition, PFG argues that the Hardwick Rd. address is the last

known address in its records.  PFG claims that Mervar was an agent of plaintiffs, not PFG.  PFG

also disputes that plaintiffs' measure of damages is equal to the fee they paid Equisearch.  PFG

further argues that this Court already concluded that plaintiffs failed to allege the existence of an

agency relationship between Equisearch and PFG.

In its motion for summary judgment, PFG argues that plaintiffs cannot establish

damages.  In addition, PFG argues that ERISA preempts plaintiffs' claims.  PFG further argues

that plaintiffs lack standing to pursue claims for breach of contract and/or violation of 6 Del. C.

§8-301(b).  In the alternative, PFG argues that it complied with its obligation to issue, register,

and deliver the shares of common stock in accordance with the Plan.  In response, plaintiffs

argue that they are entitled to damages in the amount of the fee paid to Equisearch, as well as the

decline in market value from the time plaintiffs were informed of the existence of the stock and

the time Equisearch completed the sale.  Plaintiffs further argue that ERISA does not preempt

plaintiffs' claims.  Plaintiffs claim that they have standing to assert the claims and that PFG

waived any argument to the contrary.

Because the Court finds that PFG's argument regarding damages is dispositive of these

claims, the Court will address this issue first.  As an initial matter, the parties appear to dispute

whether Iowa or Ohio law applies to plaintiffs' breach of contract claim.  Defendant argues that

the Plan provides that Iowa law applies.  In response, plaintiffs argue that they never agreed to

11

the choice of law provision.  Plaintiffs concede, however, that with respect to damages, Iowa and

Ohio law are similar.  Upon review, the Court concludes that it need not address the choice of

law issue because the result is the same regardless of which law applies.

In order to succeed on a breach of contract claim, plaintiffs must establish that they

suffered damages a result of PFG's breach.  "Damages are not awarded for a mere breach of

contract; the amount of damages awarded must correspond to injuries resulting from the breach."

*Textron Financial Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261, 1266 (Oh. Ct. App. 9th

Dist. 1996).

> As a general rule, an injured party cannot recover damages for breach of contract beyond
> the amount that is established by the evidence with reasonable certainty, and generally,
> courts have required greater certainty in the proof of damages for breach of contract than
> in tort.  The damages awarded for a breach of contract should place the injured party in as
> good a position as it would have been in *but for the breach*.  Such compensatory
> damages, often termed 'expectation damages,' are limited to actual loss, which loss must
> be established with reasonable certainty.

*Id*. (Internal quotations and citations omitted)(emphasis added).

Thus, recovery for breach of contract is limited to the actual loss suffered as a result of

the breach.  A party is "not entitled to be placed in a *better* position than he would have been in

had the breach not occurred."  *Brads v. First Baptist Church of Germantown*, 624 N.E.2d 737,

745 (Oh. Ct. App. 2nd Dist. 1993)(emphasis in original).  *See also*, *Walker Mfg. Co. v. Henkel

Const. Co.*, 246 F.Supp. 621, 634 (D.C. Iowa 1972)(a party should not be placed in a better

position that it would be in if no breach occurred).

Accordingly, in order to avoid summary judgment, plaintiff must present sufficient

evidence from which a jury could conclude that "but for" PFG's failure to provide notice and

register and deliver the stock, plaintiffs would not have incurred the Equisearch fee or the loss in

12

market value.   In essence, plaintiffs argue that the Equisearch fee "obviously" constitutes damages because had PFG not breached its obligations under the Plan, plaintiffs would not have incurred the fee.  While this argument has some superficial appeal, a close review demonstrates that plaintiffs' argument lacks merit.  In order to determine whether plaintiffs incurred any damages, the Court must analyze what would have occurred "but for" the breach.  In this case, had PFG provided notice to Dorothy Carey (or Milburn Carey's estate)[6], she could have elected to receive stock, cash, or policy credits.  Had plaintiffs elected cash, they would have received $167,573.  Plaintiffs ultimately received a total of $398, 908.44.[7]  Thus, in order to establish that plaintiffs suffered damages, plaintiffs must introduce evidence that they would have received more than $398, 908.44, had no breach occurred.  The only way plaintiffs would have been entitled to receive more than $398, 908.44 is if plaintiffs can demonstrate that they would have elected stock[8] and held onto the stock up until the point in time the stock was sold in 2007.  In this case, plaintiffs appear to presume that stock would have been elected.  Plaintiffs, however, offer absolutely no evidence in support of this conclusion and, as PFG point out, the only evidence even arguably on point supports the opposite conclusion.  Moriarty, who represented

---

[6]  For purposes of this analysis, the Court assumes plaintiffs could demonstrate a breach of the Plan and Delaware statutory law.  The Court is careful to note that it makes no determination as to whether a breach occurred.

[7]  This total represents the $374,451.84 plaintiffs received from the sale of the stock plus the $24,456.60 plaintiffs received in uncashed dividends.

[8]  If plaintiffs had elected cash, the breach undoubtedly placed plaintiffs in a far better position as it is highly unlikely that plaintiffs would have been able to obtain such a significant rate of return from other investments.  Regardless, no evidence exists to support this theory.

13

Milburn Carey's estate and acted as trustee to Milburn and Dorothy Carey's trust, testified that

he is not inclined to hold on to large holdings of stock.  Moriarty, in testifying about why he

elected to sell the shares immediately upon learning of their existence, stated as follows,

> Q: Would it have been possible for you to have retained those shares if you so chose?
>
> A: Yes.
>
> Q: And why did you choose to allow the shares to be sold?
>
> A: To–because I thought it was in the best interests of the estate and my obligation of the trust, my obligation as trustee, to sell the shares and not have such a substantial asset invested in listed securities...
>
> A: ...It's traded in the market, and it fluctuates in valuation with the trading in the market which presents a risk that I thought should not be–should be avoided at all–it's my obligation to avoid such a risk.
>
> Q: Have you done that with other clients?
>
> A: Oh, yes.
>
> ***
>
> Q: So shares like this, they're–it's risky?
>
> A: Well, they're corporate shares and they trade and they can be volatile.
>
> Q: And you determined that wasn't in the best interest of your–
>
> A: As a trustee I shouldn't have those funds invested in that security.

(Doc. 130-11 at 208-09).

Thus, the only testimony appears to indicate that it is *unlikely* that plaintiffs would have

elected stock back in 2001 and held onto it until 2007.  Even if plaintiffs had elected stock in the

first place, the evidence suggests that they would have sold it prior to 2007.  In fact, upon

learning of its existence, plaintiffs immediately sold the stock.  Regardless, plaintiffs do not

dispute this evidence and offer no evidence to support the conclusion that "but for" the breach, plaintiffs would have elected stock and held onto the stock.

Plaintiffs argue that damages should be measured from the date Equisearch contacted plaintiffs until the date Equisearch sold the stock.  Plaintiffs argue that a claim for breach of contract did not accrue until the date Equisearch contacted plaintiffs because up until that point, plaintiffs had not incurred any damages.  Plaintiffs argue, without any citation to authority, that "defendants are not entitled to any credit in the damages calculation for the appreciation in Dorothy Carey's 9,058 shares until 2007."  These arguments are rejected.  It is well settled that damages are measured by determining the position that the non-breaching party would have been in "but for" the breach.  Moreover, it is also well settled that a party may not be placed in a "better" position as a result of the breach.  Without evidence that plaintiffs would have elected stock and held onto that stock until 2007, plaintiffs are unable to establish that they suffered any pecuniary loss "but for" PFG's alleged breach.  Accordingly, PFG is entitled to summary judgment.[9]

Having concluded that plaintiffs fail to introduce any evidence from which a reasonable jury could calculate damages, the Court need not reach any of the parties' remaining arguments.

B.      Count five (fraud and misrepresentation)

In count five, plaintiffs allege that PFG engaged in fraud and misrepresentation.  This Court previously ruled that count five fails to state a claim against PFG to the extent the claim

---

[9]     The violations of the Delaware code mirror the breach of contract allegations.  Accordingly, for the same reasons the contract claim fails, PFG is entitled to summary judgment with respect to plaintiffs' alleged violations of the Delaware code.

15

depends on an agency relationship between PFG and Equisearch.  The Court determined, however, that dismissal was not appropriate to the extent the claim is asserted directly against PFG.  In the summary judgment motions, it is apparent that plaintiffs continue to base their fraud claim on an alleged agency relationship between PFG and Equisearch.  Having already concluded that plaintiffs fail to allege the existence of such a relationship, the claim fails. Regardless, as set forth below, even if plaintiffs could establish an agency relationship, the Court concludes that Equisearch is entitled to summary judgment on count five.  Therefore, PFG is entitled to summary judgment for this additional reason.  Moreover, plaintiffs offers no evidence of any fraud engaged in directly by PFG.  Accordingly, summary judgment in favor of PFG is warranted.

>2. The Equisearch Defendants

>A.      Counts one (breach of contract) and two (violation of Delaware Code)

The Equisearch Defendants move for summary judgment on counts one and two of the complaint on the grounds that they are not agents of PFG.  In addition, the Equisearch Defendants argue that plaintiffs' brief appears to concede that liability is directed only at PFG. For example, plaintiffs claim that their "contractual remedies are based upon the terms set forth in [the annuity contract], the terms of the Plan of Demutualization, as well as the contract between every issuer and shareholder expressly or impliedly found under law."  As the Equisearch Defendants are not parties to any of these agreements, summary judgment is appropriate.  In response, plaintiffs argue that an agency relationship exists and, therefore, appear to argue that the Equisearch Defendants are liable for breach of the Plan and for violations of Delaware law.

16

Plaintiffs move for summary judgment on these counts.  Although plaintiffs argue that all defendants are "jointly and severally" liable, plaintiffs make no direct claim that the Equisearch Defendants breached the Plan or Delaware law directly.  Rather, it appears that plaintiffs are claiming that the Equisearch Defendants are liable for PFG's alleged breaches and violation of Delaware law because of an alleged agency relationship.

Upon review, the Court finds that the Equisearch Defendants are entitled to summary judgment on counts one and two.  As an initial matter, the Equisearch Defendants correctly note that they are not a party to the Group Annuity, the Plan, or the stock transaction between PFG and plaintiffs.  Although plaintiffs argue that liability arises due to an alleged agency relationship between PFG and the Equisearch Defendants, plaintiffs wholly fail to explain any theory or law permitting an agent to bear responsibility for a principal's breach.[10]  Accordingly, summary judgment is warranted in favor of the Equisearch Defendants.  In addition, plaintiffs cite no law for their proposition that the Equisearch Defendants have direct liability under Delaware law. As plaintiffs themselves note, the Equisearch Defendants place unrecovered assets in the hands

---

[10]    To the extent plaintiffs are arguing that the Equisearch Defendants are liable because PFG is an undisclosed principal, the argument is rejected.  That theory arises where a party *enters into a contract directly with an agent* at the behest of an undisclosed principal. Here, plaintiffs never entered into the Plan, Group Annuity, or stock sale directly with the Equisearch Defendants.  Even if an agency relationship could be established, contractual liability could only arise by and between plaintiffs and PFG.  Regardless, it is unclear whether plaintiffs are even making this argument.  In their brief, plaintiffs indicate that "...*PFG* remains liable by statute as Equisearch, its agent, secured Mr. Moriarty's signature without disclosure of PFG as the principal."  (Doc. 125-1 at 26)(emphasis added).  Thus, it is not entirely clear whether plaintiffs are even arguing that the Equisearch Defendants are liable for breach of the Plan, Group Annuity, and stock sale.

17

of the rightful owner.  There is no indication that the Equisearch Defendants actually *issue* stock.  These claims also fail for the same reasons set forth above, namely, that plaintiffs are unable to establish damages incurred as the result of any alleged breach.  Accordingly, the Equisearch Defendants are entitled to summary judgment on counts one and two.

      B.      Count three (violation of the Ohio Consumer Sales Practices Act)

The Equisearch Defendants move for summary judgment on the grounds that only natural persons, *i.e.*, not trustees or executors, have standing to bring a claim under the Ohio Consumer Sales Practices Act.  In response, plaintiffs argue that it need not respond to this claim because the Court dismissed count three in its Order of Dismissal.

Upon review, the Court finds that the Equisearch Defendants are entitled to summary judgment.  Contrary to plaintiffs' misguided position, the Court made no determination as to the merits of any of the claims asserted by plaintiffs against the Equisearch Defendants, as these defendants did not seek dismissal.  Therefore, the Equisearch Defendants' motion is unopposed and plaintiffs do not dispute that trustees and executors lack standing to assert a claim under the Ohio Consumer Sales Practices Act.  Accordingly, summary judgment is warranted in favor of the Equisearch Defendants.

      C.      Count four (breach of the Agreement)

In count four, plaintiffs allege that the Equisearch Defendants breached the Agreement.  Although plaintiffs purport to move on all counts, plaintiffs' motion contains no discussion of this claim.  The Equisearch Defendants argue that they are entitled to summary judgment because plaintiffs cannot show that the Equisearch Defendants breached the Agreement.  In response, plaintiffs argue that the Equisearch Defendants breached the Agreement because "the

18

language of the Asset Location Agreement does not recite nor provide what Equisearch was

actually doing or did" in the transaction.  Plaintiffs also argue that the terms "locate," "recover,"

and "recovery" do not apply because "they lead a party to believe that the asset or property was

something to be recovered, like buried treasure...."  Plaintiffs further argue that the Agreement is

vague or misleading because it does not describe the actual transaction.

Upon review, the Court finds that the Equisearch Defendants are entitled to summary

judgment because plaintiffs fail to introduce evidence that the Equisearch Defendants breached

the Agreement.  The Agreement provides as follows,

> It is hereby acknowledged and understood....that EQUISEARCH has
> rendered investigatory and research services for OWNER with respect to
> the recovery of an asset belonging to OWNER and that EQUISEARCH
> has provided assistance to OWNER and will continue to assist OWNER
> with respect to the recovery of the asset for OWNER.

As the Equisearch Defendants point out, the agreement clearly indicates that Equisearch

has already provided investigatory and research services, as well as assistance to OWNER.  The

Agreement further provides that Equisearch will contine to assist owner with respect to the

recovery of the asset.  That is precisely what the Equisearch Defendants did in this case.

Equisearch researched Perma Seating and thereafter contacted plaintiffs.  After plaintiffs

returned papers allowing the stock to be transferred, Equisearch assisted in effectuating the

transfer.  Plaintiffs' argument that stock cannot be "recovered" is rejected outright.  Equisearch

informed plaintiffs that it is in the business of locating the rightful owner of assets, which would

otherwise escheat to the state.  There is no indication that Mr. Moriarty, an attorney with decades

of experience, believed that the asset in question was something akin to "buried treasure."

Moreover, plaintiffs admit that they believed the asset may have been related to the Group

Annuity issued by PFG.  Nonetheless, Moriarty signed the Agreement.  In all, plaintiffs point to no evidence indicating that the Equisearch Defendants failed to perform the Agreement. Accordingly, the Equisearch Defendants are entitled to summary judgment.[11]

  D.  Count five (fraud and misrepresentation)

  It appears that plaintiffs are claiming that the fraud claim is based on the Equisearch Defendants' failure to disclose that nature of the asset.  In addition, plaintiffs argue that the Equisearch Defendants failed to disclose "PFG as the source of the asset."  Thus, it appears that plaintiffs are claiming that the Equisearch Defendants engaged in fraud by concealing facts.  In addition, in the brief in opposition to the Equisearch Defendants' motion for summary judgment, plaintiffs allege that the Equisearch Defendants fraudulently informed plaintiffs that the asset had a value "in excess" of $50,000 when, in fact, its value was ten times greater.

  The Equisearch Defendants argue that they are entitled to summary judgment because they had no duty to disclose any information to plaintiffs.  In addition, the Equisearch Defendants argue that the statement regarding the value of the asset is true.  Moreover, according to these defendants, plaintiffs fail to establish that they relied on either the alleged concealment or misstatement.

  To succeed on a claim for fraud, plaintiff must prove, "(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand,

---

[11]  Plaintiffs make a myriad of other arguments, none of which have merit.  For example, plaintiffs argue that neither Dorothy Carey nor National City Bank were "lost" or "needed to be located." Plaintiffs also claim that the breach of the Agreement amounts to a breach of PFG's contractual and statutory duties and constitutes "fraud in all defendants."  None of arguments relate to whether the Equisearch Defendants breached the Agreement.

(c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance."  *State ex rel. The Illuminating Co. v. Cuyahoga County Court of Common Pleas*, 776 N.E.2d 92 (Ohio 2002) (citations omitted).

Where fraud is based on concealment of fact, the party claiming fraud must demonstrate that there exists a duty of disclosure.  "A duty to disclose arises primarily in a situation involving a fiduciary or other similar relationship of trust and confidence."  *Fed. Mgt. Co. v. Coopers & Lybrand*, 738 N.E.2d 842 (Oh. Ct. App. 10th Dist. 2000).  The Ohio Supreme Court has defined the term "fiduciary relationship" as a relationship in which "special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust."  *Ed Schory & Sons, Inc. v. Society National Bank*, 662 N.E.2d 1074, 1081 (Ohio 1996) (quoting *In Re Termination of Employment of Pratt*, 321 N.E.2d 603, 609 (Ohio 1974)).  A fiduciary relationship may be created out of an informal relationship, but this is done only when both parties understand that a special trust or confidence has been reposed.  *Ed Schory & Sons*, 662 N.E. 2d at 1081.

Upon review, the Court finds that plaintiffs fail to introduce sufficient evidence to demonstrate that the Equisearch Defendants owed plaintiffs a duty of disclosure.  Plaintiffs appear to argue that PFG owed statutory duties to properly register and deliver the shares.  According to plaintiffs, the Equisearch Defendants are agents of PFG.  Thus, pursuant to these statutory duties, the Equisearch Defendants owed plaintiffs a duty of disclosure.  The Court rejects this argument.  To establish a claim for fraud based on a failure to disclose, plaintiffs

21

must establish that both plaintiffs and the Equisearch Defendants understood that "a special trust or confidence had been reposed.[12]"  Plaintiffs fail to introduce any evidence supporting this theory.  In fact, the evidence weighs strongly in favor of the Equisearch Defendants.  Moriarty is an attorney with decades of experience.  Plaintiffs and the Equisearch Defendants had no prior relationship.  Moriarty reviewed the Agreement himself, as did another attorney.  Moriraty then attempted to negotiate the fee and ultimately indicated in a cover letter that the Agreement was conditioned upon the asset "not being the Principal Mutual Insurance Company."  The letter further provides that, by continuing with recovery of the asset, Equisearch agrees that, in the event the asset is related to PFG, a "new agreement" will be necessary.[13]  In all, the facts demonstrate that this transaction was an arms length business deal.  There is no indication that a

---

[12]     To the extent plaintiffs are claiming that the Equisearch Defendants owed plaintiffs certain statutory duties because they are agents of PFG, the argument is rejected.  As an initial matter, as set forth above, PFG did issue the stock in book entry form.  Thus, the Court cannot say, based on the lack of evidence provided by plaintiffs, that the Equisearch Defendants were "transfer agents."  Regardless, in order to succeed with their fraud claim, plaintiffs must show that PFG and plaintiffs were in a fiduciary relationship.  The fact that PFG may have owed plaintiffs contractual or statutory duties does not render PFG a fiduciary.  Plaintiffs make no argument whatsoever that PFG and plaintiffs were in a fiduciary relationship.

[13]     The Equisearch Defendants argue that the cover letter demonstrates that plaintiffs were on notice that the asset might be related to PFG.  Plaintiffs do not allege that the cover letter is a basis for the alleged breach of the Agreement.  This is understandably so given that Moriarty, an attorney, signed the Agreement without attempting to amend the language contained therein.  Moreover, after learning that the asset was in fact related to PFG, Moriarty assisted the Equisearch Defendants in transferring the stock.

fiduciary relationship existed between the Equisearch Defendants and plaintiffs.  Accordingly, no duty to disclose existed and the Equisearch Defendants were under no obligation to inform plaintiffs of the precise nature of the asset.[14]

The Court further concludes that, to the extent plaintiffs base their fraud claim on Rothman's statement that the asset had a value "greater than $50,000," summary judgment is warranted in favor of the Equisearch Defendants.[15]  As an initial matter, the statement is true on its face.  Even if the statement could be considered misleading, there is no evidence that the Equisearch Defendants made the statement with a knowing or reckless disregard for its truth.  Simply put, there is no evidence whatsoever regarding the context in which the Equisearch Defendants learned the value of the stock.  It is possible that, at the time the representation was made, that the Equisearch Defendants knew only that the value exceeded $50,000.  Moreover, even if the statement were intentionally or recklessly misleading, there is no evidence that plaintiffs relied on the statement.  In fact, Moriarty testified that he believed he had a fiduciary duty to sell the stock and pay the fee.[16]  There is no indication that Moriarty believed that the value of the asset was "near" $50,000.  Nor is there any indication that Moriarty's actions would

_____

[14]     To the extent plaintiffs are claiming that the Agreement itself is fraudulent, the argument is rejected.

[15]     Plaintiffs rely heavily on *Carton v. Choice Point*, 482 F.Supp. 2d 533 (D.N.J. 2007).  In that case, a New Jersey district court reconsidered its decision to dismiss a fraud claim based on a similar statement.  *Carton* is easily distinguishable in that the case was before the Court on a motion to dismiss.  Here, plaintiffs must come forward with evidence to support their claim.  They have failed in this regard and, therefore, *Carton* has no application.

[16]     It appears that Moriarty believed he could not refuse to pay the fee because plaintiffs might get sued.

23

have been different had he known the value of the stock before signing the Agreement.  In fact, after he signed the Agreement and the cover letter purporting to exclude PFG stock from the Agreement, he nonetheless assisted Equisearch in effectuating the transfer of the stock.  There is simply no evidence that plaintiffs relied on the allegedly fraudulent statement.  Accordingly, the Equisearch Defendants are entitled to summary judgment.

### CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment or Partial Summary Judgment is DENIED and defendants' motions are GRANTED.

IT IS SO ORDERED.


 /s/ Patricia A. Gaughan_____
PATRICIA A. GAUGHAN
United States District Judge

Dated: 3/8/10

24